COLEMAN, Justice,
for the Court:
¶ 1. The instant matter arises from the financial portion of a bifurcated divorce trial. Tanya Dale Wright Sanderson and Hobson L. Sanderson divorced after seventeen years of marriage. When Tanya and Hobson married in 1994, Tanya signed *432 a prenuptial agreement the day before their marriage, and upon divorce, the chancellor enforced the terms of the agreement. Tanya appealed. She argues that the prenuptial agreement is procedurally and substantively unconscionable. She also claims, among other things, that the chancellor erred in not finding a joint bank account contained commingled, marital property. We affirm the trial court on its finding that the prenuptial agreement is not procedurally unconscionable. We reverse and remand for further proceedings on whether the prenuptial agreement is substantively unconscionable. We also hold that certain funds, used for familial purposes, kept in a joint bank account created after the marriage began, do not fall within the parameters of the prenuptial agreement.

FACTS AND PROCEDURAL HISTORY

¶ 2. After dating for two years, Tanya Sanderson and Hobson Sanderson married on July 23, 1994, in Decatur, Alabama. Hobson was a sixty-two-year-old businessman. He owned Sanderson Construction and Sanderson Ready-Mix. The value of his assets at the time of marriage was approximately $3,580,000. Tanya was twenty-eight years old, and she had attended one year at a four year college studying music and one semester at a community college. She also had about five years of clerical experience as a deputy clerk at the Lee County Chancery Clerk’s office. The value of her assets at the time of'marriage was about $135,000, and she had a young daughter.
¶ 3. The parties decided to marry only a few weeks before the wedding ceremony. The ceremony was a small and casual event, and no formal invitations were sent. Two weeks prior to the ceremony, Hobson approached Tanya regarding the execution of a prenuptial agreement. Hobson’s attorney prepared the agreement and told Hobson to encourage Tanya to seek outside legal counsel. The agreement contained a signature line for Tanya’s attorney. Hobson’s brother and CPA for Hobson’s construction company, Tom Sanderson, prepared Hobson’s financial statement to be attached to the agreement. Tanya prepared her financial statement, and she gave it to Tom on July 18 or 19. The final agreement for the parties to sign, that was supposed to have the financial statements attached to it, arrived the morning of July 22 — the day before the wedding.
¶ 4. The agreement eliminated all rights to spousal support, and it deemed all property owned before marriage and all property acquired during the marriage to remain separate property if traceable. Specifically, it stated that:
WHEREAS, the parties desire that all property now owned by each and set forth herein on the appropriate Exhibits or any property hereafter acquired by each that shall be traceable to proceeds or appreciation from their separate property as set forth herein, shall for testamentary, intestate succession, and for their lifetimes and for any and all other purposes, be free from any claim of the other that may arise by reason of the contemplated marriage, notwithstanding any and all State laws to the contrary; any property acquired after the marriage not acquired as a result of the separate property as defined herein shall not be subject to this Agreement: IT IS, THEREFORE, AGREED THAT:
[[Image here]]
After the solemnization of the marriage between the parties, each of them shall separately retain all rights in his or her own property, real and/or personal, whether now owned or hereafter acquired, and each of them shall have and maintain, regardless of circumstances or change of circumstances, the absolute *433 and unrestricted right to dispose of and maintain use and retain the use and ownership of such separate property, free from any claim that may be made by the other by reason of or as a result of their marriage, and with the same effect as if no marriage had been consummated between them, notwithstanding any State laws to the contrary; and each party waives and releases all rights, statutory or otherwise, in and to the other’s property described above at its present value, in addition to any appreciation in value, following the marriage, that may arise by law as a result of the marriage of the parties.
Further, the agreement stated that neither party was entitled to alimony or any part of the other party’s “investments, earnings, gifts, or inheritance.” The agreement also covered what each party would receive upon the death of the other party. Tanya would receive $100,000 from Hob-son’s estate, and Hobson would receive $20,000 from Tanya’s estate.
¶ 5. On July 22, the day before the wedding, Hobson gave the agreement to Tanya and requested she have an attorney sign it. Tanya testified that the first time she saw the agreement was on July 22, and she took the agreement to the law office of her cousin, Jimmy Doug Shelton. Tanya discussed the agreement with Shelton for about ten minutes before she convinced him to sign it. Shelton testified that Tanya’s number one concern was Shelton’s signature and that she did not seem to want legal advice about the agreement. Tanya appeared eager to drive to Decatur to finish planning the wedding. Shelton told Tanya that the agreement was one-sided, and he needed more time to review it. Tanya stated that she and Hob-son would not divorce; Shelton signed the agreement.
¶ 6. At trial, witnesses presented conflicting testimony as to when Tanya signed the agreement and as to whether the financial disclosures were attached to the agreement when she did. Tanya testified she signed the agreement after the wedding at Hobson’s request. Hobson testified that Tanya signed it before the wedding. Hobson further testified that the financial disclosures were attached to the agreement at the time Shelton signed it. However, Tom also testified that the financial disclosures had not been initialed on each page like the agreement. Tom stated that he had tried to contact Tanya to have her come to his office, but she was already in Decatur, Alabama. Tanya initialed each page about a week after the wedding, and she testified that she had not seen the financial disclosures until she initialed them after the wedding.
¶ 7. Tanya testified that she did not understand the extent of her rights that she was forfeiting by signing the agreement, and if she had understood, she would have postponed the wedding. She further testified that Hobson did not want her to work after their marriage and that he promised to take care of her for the rest of her life. Tanya stated that she was generally aware of Hobson’s wealth, but he was secretive about it. About a year or two after they married, Tanya and Hobson opened a joint banking account, and Tanya deposited Hobson’s salary checks into the account each month. They filed joint tax returns. However, the child support Tanya received from her daughter’s father accumulated and remained in a separate account. The child support money has since been used for the daughter’s college expenses.
¶ 8. After the parties filed for divorce, a hearing was held on whether the prenuptial agreement was enforceable. The court held the agreement was enforceable. In 2010, the trial court bifurcated the trial. The first portion of the bifurcated trial was *434 the grant of divorce; Tanya was granted a divorce on the ground of cruel and inhuman treatment: The second portion of the trial was division of financial assets.
¶ 9. During the financial portion of the trial, the chancellor found the prenuptial agreement to be enforceable, and the chancellor awarded assets as per the agreement. The parties were awarded their separate property: Hobson was awarded all of his corporate assets, multiple real properties, six financial accounts, and various personal items such as furniture, guns, and jewelry. Tanya was awarded two financial accounts, a piece of real estate that had been deeded to her by her parents, and various personal property classified as gifts, including hunting trophies, guns, furniture, art, a motorcycle, and jewelry.
¶ 10. The court also specifically found that. the joint checking account was a “clearing house to facilitate the transfer of funds,” and therefore, it was traceable to the source of the income, Hobson, and was his separate property. One of the investment accounts in Hobson’s name had been funded in part with money from the joint account, but it remained separate. The court found that the additional account in which the child support money was accruing was not subject to distribution because it was for the benefit of the child.
¶ 11. The court valued Tanya’s separate property at approximately $424,597.01, and it valued Hobson’s separate property at $3,544,806.00. Tanya appealed.

ISSUES

¶ 12. On appeal, Tanya brings sixteen issues classified into four general categories: (I) the prenuptial agreement, (II) commingling of marital assets and the improper classification of investment accounts and bank account, (III) the distribution of marital property, and (IV) the mislabeling of property Tanya conveyed to her parents. Hobson presents three broader issues concerning whether the chancellor erred in his application of the prenuptial agreement.

STANDARD OF REVIEW

¶ 13. Contract interpretation is a question of law and is reviewed de novo. Harris v. Harris, 988 So.2d 376, 378 (Miss.2008) (citing Warwick v. Gautier Util. Dist., 738 So.2d 212, 215 (Miss.1999)). However, the Court considers the chancellor’s decision of whether to enforce a prenuptial agreement under the abuse of discretion or manifest error standard. Mabus v. Mabus, 890 So.2d 806, 810 (Miss.2003). The Court will not disturb the findings of the chancellor unless they are “manifestly wrong, clearly erroneous, or applied the wrong legal standard.” Id. (citing McNeil v. Hester, 753 So.2d 1057, 1063 (Miss.2000)). The Court also applies a limited standard of review for the distribution of property in divorce cases. Owen v. Owen, 798 So.2d 394, 397 (Miss.2001) (citing Reddell v. Reddell, 696 So.2d 287, 288 (Miss.1997)). The chancellor’s ruling of the division and distribution “will be upheld if it is supported by substantial credible evidence.” Owen, 798 So.2d at 397 (quoting Carrow v. Carrow, 642 So.2d 901, 904 (Miss.1994)). “This Court will not substitute its judgment for that of the chancellor ‘[e]ven if this Court disagreed] with the lower court on the finding of fact and might ... [arrive] at a different conclusion.’ ” Owen, 798 So.2d at 397-98 (quoting Richardson v. Riley, 355 So.2d 667, 668 (Miss.1978)).

DISCUSSION

I. Whether the chancellor erred in finding that the prenuptial agreement was procedurally conscionable.
¶ 14. Mississippi law concerning prenuptial agreements is not well set- *435 tied. However, it is well settled that prenuptial agreements are enforceable like any other contract. Estate of Hensley v. Estate of Hensley, 524 So.2d 325, 327 (Miss.1988); see also Smith v. Smith, 656 So.2d 1143, 1147 (Miss.1995); Mabus v. Mabus, 890 So.2d 806, 818 (¶ 53) (Miss.2003). Prenuptial agreements also have the heightened requirement of being fair in the execution. Estate of Hensley, 524 So.2d at 327. “Fair in the execution” means that the agreement must be entered into voluntarily, and each party must disclose his or her financial assets. Id., see also Mabus v. Mabus, 890 So.2d at 818-19 (¶ 53). We hold that the chancellor did not err in finding the agreement was voluntarily entered into with fair disclosure.
¶ 15. Fair disclosure can be found either by the parties providing financial disclosure statements or by their independent knowledge of each other’s financial state. In the case sub judice, the chancellor resolved the conflicting testimony about whether the financial statements were attached in Hobson’s favor, finding that they were attached to the prenuptial agreement. Upon review, we cannot hold that the chancellor’s finding was manifest error.
¶ 16. Tanya also had the advice of independent counsel that the agreement was one-sided, and she chose to proceed. Independent counsel is not necessarily required in order for a prenuptial agreement to be procedurally conscionable. Mabus, 890 So.2d at 821 (¶ 63). However, whether parties had a reasonable opportunity to consult with independent counsel if they so desired is an important consideration in evaluating the overall procedural conscion-ability of the contract. Id. Although the agreement was signed in close proximity to the wedding, the informal nature and scope of the wedding, combined with the presence of independent counsel and the attachment of the financial disclosures, does not indicate a level of coercion or surprise that would make Tanya’s entry into the agreement involuntary. Accordingly, we hold that the chancellor did not err in finding the prenuptial agreement to be procedurally conscionable.
II. Whether the chancellor erred in failing to consider the substantive unconscionability of the prenuptial agreement.
¶ 17. Confusion has arisen in Mississippi as to whether courts should consider the substantive unconscionability of prenuptial agreements. The chancellor in the instant case stated in his Final Decree of Divorce that “some states look at both substantive and procedural unconscionability, Mississippi courts do not.” The lack of clarity in the law has arisen perhaps because of the Mabus Court’s use of the phrase “fundamental fairness”' instead of “substantive unconscionability.” The Mabus■ Court wrote as follows:
The claim that the estates of the parties are so disparate that it questions fundamental fairness is of no consequence. An antenuptial agreement is as enforceable as any other contract in Mississippi. Of course, there must be fairness in the execution and full disclosure in an ante-nuptial agreement in Mississippi.
Id. at 821 (¶ 64) (internal citations omitted). The above-quoted language constitutes a holding that the Mabus prenuptial agreement was not fundamentally unfair but falls short of a blanket prohibition against considering substantive uncon-scionability in all prenuptial agreements. The Mabus Court’s language does not prohibit considering substantive unconsciona-bility in prenuptial agreements as a rule of law. Mabus also makes two further asser *436 tions that have confused our law of prenuptial agreements.
f 18. First, Mabus states that a prenuptial agreement is a contract like any other contract that is subject to the same rules of construction and interpretation applicable to contracts. Mabus, 890 So.2d at 819 (¶ 53) (citing Estate of Hensley, 524 So.2d at 327). However, prenuptial agreements cannot be contracts like any other if courts cannot consider whether a prenuptial agreement can be substantively unconscionable. “The law of Mississippi imposes an obligation of good faith and fundamental fairness in the performance of every contract ... this requirement is so pronounced that courts have the power to refuse to enforce any contract ... in order to avoid an unconscionable result.” Sawyers v. Herrin-Gear Chevrolet Co., 26 So.3d 1026, 1034-35 (¶ 21) (Miss.2010) (emphasis added); see also Covenant Health & Rehab. of Picayune, LP v. Estate of Moulds ex rel. Braddock, 14 So.3d 695, 705 (¶ 13) (Miss.2009).
¶ 19. . Within contract law, there are many different types of contracts. The Legislature has carved out a remedy for unconscionable sales contracts. See Miss. Code Ann. § 75-2-302 (Rev. 2002). However, Section 75-2-302 has been applied to other types of contracts, such as arbitration contracts. Covenant Health & Rehab. of Picayune, 14 So.3d at 706. Similarly, the Court has analyzed the unconscionability of domestic relations contracts. See id. (“We also have found contracts to be unconscionable for clauses other than arbitration agreements.”); In the Matter of Johnson’s Will, 351 So.2d 1339 (Miss.1977) (considering unconscionability for a contract between a husband and wife preventing a wife from revoking her husband’s will); West v. West, 891 So.2d 203, 213 (Miss.2004) (“A contract may be either procedurally or substantively unconscionable.”). Accordingly, because prenuptial agreements are contracts like any other, substantive unconscionability must be considered.
¶ 20. The Court has even gone further and defined an unconscionable contract in domestic relations contracts. “[I]t is also the law that courts of equity will not enforce an unconscionable contract. In Terre Haute Cooperage, Inc. v. Branscome, 203 Miss. 493, 35 So.2d 537 (1948), this Court defined an unconscionable contract as ‘one such as no man in his senses and not under a delusion would make on the one hand, and as no honest and fair man would accept on the other.’ ” In re Johnson, 351 So.2d at 1341; see also West, 891 So.2d at 213 (¶ 27) (“Substantively, the terms of the property settlement agreement are less than desirable, but we cannot say that no spouse in his or her right mind would agree to what is, at worst, a begrudging but generous offer ... to provide alimony....”).
¶ 21. Second, the Mabus Court appears to have considered substantive un-conscionability after stating fundamental fairness was of no consequence. In In re Johnson, the Court explained how to determine if a contract is unconscionable: “In determining whether this contract was unconscionable, it is necessary to analyze what the widow was to receive under the will in contrast to her rights absent the will under the laws of descent and distribution.” In re Johnson, 351 So.2d at 1342. In other words, the Court considered what the wife would have received if the contract had not existed and if the wife was able to renounce her husband’s will. Similarly, even in light of the premarital agreement, the Mabus Court considered the White factors for lump sum alimony and the Ferguson factors for distribution of the marital property. Mabus, 890 So.2d at 821-23 (¶¶ 65-71) (citing White v. White, *437 557 So.2d 480, 483 (Miss.1989); Ferguson v. Ferguson, 639 So.2d 921 (Miss.1994)). Also, in Estate of Hensley, in determining whether the prenuptial agreement between the husband and wife was enforceable, the Court noted that “a full reading of the record divulges that Mr. Hensley had actually been very benevolent.” Estate of Hensley, 524 So.2d at 328. Thus, Mississippi has implicitly considered the substantive unconscionability of premarital agreements. We hold that, given the contract law on unconscionability, substantive unconscionability for premarital agreements must be considered by trial courts.
¶ 22. Contract law has largely, with the exception of the sale of goods, remained common law. Therefore, inevitably, contradictions arise. Unconsciona-bility looks at the terms of the contract. See West, 891 So.2d at 213. Unconsciona-bility also looks at the circumstances existing at the time the contract was made. Vicksburg Partners, L.P. v. Stephens, 911 So.2d 507, 517 (¶ 22) (Miss.2005), overruled on other grounds by Covenant Health & Rehab. of Picayune, LP v. Estate of Moulds ex rel. Braddock, 14 So.3d 695 (Miss.2009).[1] We hold that substantive un-conscionability feasibly could be measured at the time the prenuptial agreement is made; measuring it at the time the agreement is made would maintain consistency in the law. It also would ensure that the Court does not “relieve a party to a freely negotiated contract of the burdens of a provision which becomes more onerous than had originally been anticipated.” Mabus, 890 So.2d at 819 (¶ 53) (quoting Estate of Hensley, 524 So.2d at 328).
¶ 23. Because the chancellor in the case sub judice operated under the erroneous conclusion that the prenuptial agreement could not be analyzed for substantive un-conscionability, we reverse and remand the case for him to do so. We decline the dissent’s invitation to conduct that analysis for the first time on appeal, because the error consisted of making no finding at all rather than the wrong finding. In other words, there is no decision on point for us to analyze for error.
III. Whether the chancellor erred in finding joint bank account funds were not commingled.
¶ 24. Tanya argues the chancellor improperly found certain assets not commingled for purposes of making an equitable distribution of marital property. Included in the charge of error is a joint bank account. The chancellor found that the joint bank account was a clearinghouse for Hobson’s money and could be traced back to Hobson. While the chancellor labeled the accbunt as marital property in his classification of assets, he treated it as separate property under the terms of the prenuptial agreement during his equitable distribution of the marital estate.
¶ 25. We hold that the money deposited into the joint checking account became a marital asset subject to equitable division because of its familial use. See A & L, Inc. v. Grantham, 747 So.2d 832, 838 (Miss.1999) (“[N]on-marital assets may be converted to marital assets if they are commingled with marital assets or used for familial purposes, absent an agreement to the contrary.”) (citing Heigle v. Heigle, 654 So.2d 895, 897 (Miss.1995)). While it is *438 true that Hobson was the only one depositing money into the account, and that the funds could be traced solely to him, Mississippi’s jurisprudence clearly establishes that property is presumed to be marital property unless it can be shown to have been exchanged for a separate, and not a familial, asset or function. Maslowski v. Maslowski, 655 So.2d 18, 20 (Miss.1995).
¶ 26. In the case sub judice, the chancellor treated the joint account as separate because the monies deposited could be traced solely to Hobson. The chancellor determined that Tanya made no contributions. However, the chancellor erred by failing to address the familial use of the funds and Tanya’s contribution in helping to disburse the funds for the familial purposes. Under' the law cited above, her contributions and the familial use to which the money in the joint account was put changed the legal nature of the money in the account from separate property subject to tracing to marital property. Absent a contractual provision that indicates the parties intended familial use monies to be separate and subject to tracing, thereby waiving the operation of law that so converts it, we are constrained to hold the parties intended for our law regarding familial use to apply.[2]
¶ 27. We acknowledge that Tanya and Hobson could have drafted the prenuptial agreement to address funds commingled for familial use, see A & L, Inc., 747 So.2d at 838; Heigle, 654 So.2d at 897, but they did not. In the absence of such contractual language, the law regarding commingled, familial use money applies.

CONCLUSION

¶ 28. Although we herein express no opinion regarding whether the contract at issue in the instant case is substantively unconscionable, we hold that prenuptial agreements are contracts like any other, and therefore are subject to substantive unconscionability analysis. Furthermore, we reverse the chancellor’s finding that the joint bank account funds were not commingled. After due consideration of the other issues raised, we discern no other errors. Accordingly, we remand the case to Monroe County Chancery Court for a determination of whether the prenuptial agreement was substantively unconscionable at the time it was entered into by the parties and other further proceedings consistent with the instant opinion.
¶ 29. AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
WALLER, C.J., LAMAR, KITCHENS, PIERCE AND KING, JJ., CONCUR. RANDOLPH, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED IN PART BY CHANDLER, J. CHANDLER, J„ CONCURS IN PART AND DISSENTS IN PART WITH ■ SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J.; RANDOLPH, P.J., JOINS IN PART.

. Vicksburg Partners held two clauses of an arbitration agreement to be unconscionable. Vicksburg Partners, 911 So.2d at 523-24 (¶¶ 42, 45). Subsequently, in Covenant Health, the Court considered the many jurisdictions that have found contracts to be unconscionable. Covenant Health, 14 So.3d at 703-07 (¶¶.26-33). Under the same basic rules of unconscionability, the Court held that an arbitration contract, similar to the one in Vicksburg Partners, was completely unconscionable. Id. at 525-26 (¶ 49).

. It is interesting to note that the Mabus Court placed great importance on the fact that, in Mabus, the parties "meticulously maintained separate accounts for. their premarital separate property and for the gifts and inheritances that they each received during the marriage.” Mabus, 890 So.2d at 823 (11 71). By creating the join account at issue, the parties in the case sub judice were not so meticulous.-