# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-01312-COA

JOSEPH ADAM McDONALD                             APPELLANT

v.

CASI PRUWITT                                         APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 06/14/2023 |
| TRIAL JUDGE: | HON. VICKI B. DANIELS |
| COURT FROM WHICH APPEALED: | TATE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JOHN S. GRANT IV |
| | BROOKE TRUSTY GRANT |
| ATTORNEY FOR APPELLEE: | JERRY WESLEY HISAW |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 05/27/2025 |
| MOTION FOR REHEARING FILED: | 07/01/2025 - GRANTED; AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 11/18/2025 |

**EN BANC.**

**EMFINGER, J., FOR THE COURT:**

### MODIFIED OPINION ON MOTION FOR REHEARING

¶1.     The motion for rehearing filed on behalf of Appellant Joseph Adam McDonald is granted. The previous opinion of this Court is withdrawn, and this opinion is substituted in its place.

¶2.     On June 14, 2023, the Tate County Chancery Court entered an order granting grandparent visitation to P.J.'s[1] maternal grandmother, Casi Pruwitt. Aggrieved by this order,

---

[1] We use initials to protect the minor's identity within this opinion.

P.J.'s biological father, Joseph Adam McDonald, appeals.

## FACTS AND PROCEDURAL HISTORY

¶3.     P.J. was born in 2015 to McDonald and Patsy W.[2] McDonald and Patsy were never married. After P.J. was born, Patsy lived with Pruwitt. Pruwitt testified that she worked two jobs until P.J. was six months old so that Patsy could stay home with P.J. When Patsy went back to work, Pruwitt kept P.J. in her home.

¶4.     On November 3, 2015, McDonald filed a complaint for custody and other relief against Patsy.  Patsy filed her answer and counterclaim on January 8, 2016. An "Agreed Order Establishing Child Custody, Visitation, and Other Relief" was entered on July 20, 2017, granting the parties "joint legal and physical custody of [P.J.,] with [Patsy] having primary physical custody and [McDonald] having full and reasonable visitation on weekends, holidays, summers, and other times."[3]

¶5.     Patsy later married Tyler M., and they had two children together. When P.J. was two years old, Patsy and Tyler moved from Pruwitt's home to a house directly behind her. Pruwitt testified, that "for four years of his life, I was most of what he needed and I participated in raising him and taking care of him." In July 2019, Pruwitt moved to North Carolina. Pruwitt testified that she visited with P.J. and family in Mississippi every three months in 2019 and through 2020. In March 2021, all of Pruwitt's children and grandchildren, including P.J., visited Pruwitt at her home in North Carolina for a week.

---

[2] Patsy is also referenced in the record as "Sissy."

[3] This order is not in the record on appeal; however, the description of the contents of the order is found in an "Agreed Temporary Order" entered on May 11, 2021.

¶6. In April 2021, Mississippi Child Protection Services (CPS) received information that P.J. was being abused by Patsy and Tyler. CPS removed P.J. from Patsy's home and placed him with McDonald. Patsy and Tyler's other two children were placed with Tyler's mother. As a result, on April 14, 2021, McDonald filed a petition to modify child custody, visitation, child support, and for other relief. A temporary agreed order was entered on May 11, 2021, wherein the parties agreed that P.J. should temporarily reside with McDonald. It was further agreed that Patsy would have FaceTime, Zoom, or telephonic visitation with P.J. between 7 p.m. and 8 p.m. on Tuesdays, Thursdays, and Sundays. Finally, the order stated that a guardian ad litem (GAL) should be appointed to investigate the facts and allegations in the matter, report findings to the court, and make a recommendation as to any changes in Patsy's visitation. The chancellor entered an additional order appointing Victoria Ryals as GAL on the same day.

¶7. On November 30, 2021, Patsy filed a motion requesting visitation for herself and for P.J.'s younger half-siblings. On December 17, 2021, the chancellor entered an order granting Patsy holiday visitation to be exercised using FaceTime or over speaker phone with P.J. on Christmas Day between 1 p.m. and 5 p.m. The order provided that Patsy was not to discuss the custody case, the criminal case, or Tyler with P.J. It was also ordered that P.J. be allowed to have visits with his half-siblings, no less than once per month, with neither Patsy nor Tyler present during the visits.

¶8. Pruwitt filed a motion to intervene on November 18, 2022, seeking grandparents' visitation rights and to be added to the cause of action as an intervening party. The chancellor

3

granted Pruwitt's motion on November 29, 2022, adding Pruwitt as a third party to the litigation and ordering that any visitation obligation be held in abeyance until the GAL made a recommendation to the court. McDonald filed his response to Pruwitt's motion, denying that she should be granted visitation rights.

¶9.     During the pendency of the visitation litigation, on February 17, 2023, Patsy pled guilty to the charge of permitting the continuing physical or sexual abuse of a child under eighteen and was sentenced to serve two years and six months in the custody of the Mississippi Department of Corrections. Tyler also entered a guilty plea and was incarcerated, but his sentencing order is not in the record.

¶10.    After a one-day trial on May 31, 2023, and after hearing from six witnesses, the chancellor issued her final order granting Pruwitt visitation and setting forth a visitation schedule as follows: one long weekend per month, one week during Christmas break, and two weeks during the summer.[4] The order also provided for phone or FaceTime visitation at least once per week. Further, there was to be no contact, either direct or indirect, with either Patsy or Tyler. The order also provided that Pruwitt should be allowed access to information from P.J.'s therapist and access to his school information. The chancellor did not award attorney's fees to either party.

¶11.    On June 23, 2023, McDonald filed a motion to alter or amend the judgment pursuant to Rule 59 of the Mississippi Rules of Civil Procedure, asking the chancellor to alter or amend the final order to find that Pruwitt was not entitled to any visitation. McDonald

---

[4] Most of the weekends granted to Pruwitt were holiday weekends so that P.J. did not have to be returned until Tuesday morning for school.

alleged, as he does on appeal, that Pruwitt did not establish that she had a viable relationship with P.J. at the time or that McDonald had unreasonably denied her visitation. McDonald also contended that grandparent visitation was not in P.J.'s best interest. Alternatively, he argued that the amount of visitation awarded was excessive, and he further argued that the chancellor's award is such that would typically be awarded to a non-custodial parent who resides out of state.[5] Pruwitt responded to that motion on June 28, 2023.

¶12.   Also on June 23, 2023, McDonald filed a motion for a ruling on the physical and legal custody of P.J. because the chancellor's June 14, 2023 order only settled the issue of grandparent visitation and reserved any permanent custody decision for a later date. On December 1, 2023, an order was entered awarding McDonald sole legal and physical custody of P.J., with no visitation for Patsy.

¶13.   The chancellor denied McDonald's motion to alter or amend the order on December 1, 2023, and McDonald filed his notice of appeal on December 4, 2023.

## STANDARD OF REVIEW

¶14.   We set forth our standard of review in cases such as this in *Poole v. Poole*, 392 So. 3d 1245, 1255 (¶31) (Miss. Ct. App. 2023):

> This Court reviews the chancellor's decision to grant grandparent visitation and the amount of grandparent visitation awarded under the abuse-of-discretion standard. *Martin* [*v. Coop*], 693 So. 2d [912,] 915 [(Miss.

---

[5] In her bench ruling after the May 31, 2023 hearing, the chancellor recognized that caselaw holds that grandparents are not entitled to the same visitation as non-custodial parents. The chancellor addressed the issue again in her bench ruling after the hearing on McDonald's motion to amend, stating she did not think that the visitation she awarded was excessive in any manner and that the visitation awarded to Pruwitt was what she typically awarded grandparents.

1997)]; *Smith* [*v. Martin*], 222 So. 3d [255,] 259 (¶4) [(Miss. 2017)]. "We are 'bound to accept the findings of the chancellor unless he is manifestly wrong or there is clearly an abuse of discretion.'" *Arrington* [*v. Thrash*], 122 So. 3d [144,] 148 (¶13) [(Miss. Ct. App. 2013)] (quoting *Martin*, 693 So. 2d at 915).

## ANALYSIS

**I.     Whether the chancellor erred by finding that Pruwitt proved the elements of Mississippi Code Annotated section 93-16-3(2) (Rev. 2021).**

¶15.    There are two paths that a grandparent can use to petition for visitation: Mississippi Code Annotated section 93-16-3(1) and (2) (Rev. 2021). Subsection 93-16-3(2) provides:

> (2) Any grandparent who is not authorized to petition for visitation rights pursuant to subsection (1) of this section may petition the chancery court and seek visitation rights with his or her grandchild, and the court may grant visitation rights to the grandparent, provided the court finds:
>
> > (a) That the grandparent of the child had established a viable relationship with the child and the parent or custodian of the child unreasonably denied the grandparent visitation rights with the child; and
> >
> > (b) That visitation rights of the grandparent with the child would be in the best interests of the child.

Mississippi Code Annotated subsection 93-16-3(3) defines "viable relationship":

> For purposes of subsection (2) of this section, the term "viable relationship" means a relationship in which the grandparents or either of them have voluntarily and in good faith supported the child financially in whole or in part for a period of not less than six (6) months before filing any petition for visitation rights with the child, the grandparents have had frequent visitation including occasional overnight visitation with said child for a period of not less than one (1) year, or the child has been cared for by the grandparents or either of them over a significant period of time during the time the parent has been in jail or on military duty that necessitates the absence of the parent from the home.

In *Patrick v. Boyd*, 198 So. 3d 436, 445 (¶31) (Miss. Ct. App. 2016), we explained:

6

In Mississippi, "[t]here is no common-law right to grandparent visitation. The right is purely statutory and may only be considered if the statutory criteria are met." *Aydelott v. Quartaro*, 124 So. 3d 97, 100 (¶9) (Miss. Ct. App. 2013) (citations omitted). In this case, the statute requires proof that the parents have "unreasonably denied the grandparent visitation rights with the child." Miss. Code Ann. § 93-16-3(2) (Rev. 2013); *see also* Deborah H. Bell, *Mississippi Family Law* § 5.09[2][b], at 132 (2005) (reasoning that section 93-16-3(2) is "narrowly drawn" and constitutionally sound because it "requires a finding that the child's parents have unreasonably withheld visitation").

¶16. On appeal, McDonald contends that he did not unreasonably deny Pruwitt visitation with P.J. and that any such denial did not cut off a viable relationship between P.J. and Pruwitt. While McDonald admits that Pruwitt had a viable relationship with P.J. before her move to North Carolina, he argues that the relationship ended after the move. McDonald next argues that the relationship was cut off because Pruwitt's daughter and son-in-law "brutally abused P.J., resulting in both pleading guilty to felony child-abuse charges." As a result of this abuse, McDonald contends that "contact with [P.J.'s] mother's family had to be limited to allow P.J. time to heal and attend intensive therapy."

¶17. The trial took place on May 31, 2023. Since McDonald had been granted custody of P.J. in April 2021, Pruwitt testified, she had seen the child a total of three times—two consecutive days in June 2021 and (for the last time) one day in November 2021. Pruwitt testified that the last time she spoke with P.J. was through FaceTime on December 31, 2021. Pruwitt told the court that beginning around August 2021, most of her communication was not with McDonald but with his mother through texting and messaging.[6] Pruwitt also testified she was denied visitation with the child in September 2021, March 2022, September 2022,

---

[6] The messages admitted into evidence appear to be Facebook messages.

and November 2022.

¶18.    The chancellor questioned Pruwitt about the day that court was postponed on March 28, 2023. The chancellor stated that she had instructed McDonald's attorney to make sure Pruwitt got to visit with the child on that day. Pruwitt responded that she did not get to see P.J. on that date. When the chancellor asked Pruwitt if she knew why, she told the chancellor, "They wouldn't let me." Pruwitt further testified that she had received no response to her messages after April 2022. According to Pruwitt, she never witnessed any abuse of P.J. and believed that whatever occurred must have happened after her move to North Carolina.

¶19.    Testifying in McDonald's behalf, McDonald's mother describes a completely different relationship between Pruwitt and P.J. than Pruwitt relayed in her testimony.[7] McDonald's mother stated that neither she nor her son had denied visitation to Pruwitt. She also told the chancellor that visits with Pruwitt led to problems at school and the need for more therapy. Further, she did not think that Pruwitt should have any visitation and testified that she thought Pruwitt had witnessed the abuse, but she provided no evidence of her allegation.

¶20.    McDonald also testified that he had not unreasonably denied Pruwitt visitation. He admitted to denying her visitation on at least one occasion when she had P.J.'s half-siblings with her. McDonald testified that the therapist had advised against P.J. visiting with his half-siblings. According to McDonald, the therapist thought such a visit was ill-advised because P.J. did not understand why he was abused when his siblings were not. McDonald testified:

---

[7] McDonald's mother testified that P.J. did not want to see Pruwitt. McDonald recounts cold encounters between the two, while Pruwitt testified that during FaceTime calls, P.J. told her he loved her and wanted to come to North Carolina.

Q. And I just want to make sure I understand fully. With regard to Casi Pruwitt, if she wants to visit even today at your home, is that something that you would deny?

A. No. She - - she's more than welcome to come to the house and visit him. Just like when she was here last time. She's more than welcome to come to the house and visit him.

¶21. Ishita Pareek became P.J.'s therapist in April 2021. According to Pareek, P.J. came to her with "complaints of physical, verbal, emotional, and sexual abuse from his mother and stepfather." All of Pareek's testimony was based upon her communications with P.J.:

[P.J.] is seven years old. He is very angry, very upset, very confused in regards to why these things happened to him. He has PTSD and he acts out at school. He has issues with anxiety, sleeping, nightmares, all the things that would be typical for a child with PTSD.

Pareek testified that P.J. trusts and loves McDonald and feels safe in his care. Pareek has never talked to Pruwitt or witnessed P.J. and Pruwitt together, yet she testified it was in P.J.'s best interest to never visit with Pruwitt again.

¶22. The GAL recommended that McDonald have both legal and physical custody of P.J. She further recommended that an injunction be put in place to prevent Tyler from ever seeing P.J. again and recommended that Patsy have no contact with P.J. until further order of the court. The GAL testified that while she believes McDonald's and his mother's motivation was to protect P.J., when the GAL met them in her office, "they were absolutely desperate to keep Pruwitt from visiting with [P.J.]." The GAL testified that no testimony she heard at trial changed her recommendation that P.J. should be allowed to visit with Pruwitt.

¶23. In her order, the chancellor noted that the GAL had recommended grandparent visitation for Pruwitt. She further found that Pruwitt had a viable relationship with P.J. and

9

that she had been unreasonably denied visitation with him. As a result, the chancellor concluded that a "structured visitation schedule would be in the best interest of the minor child."

¶24.    In *Greer v. Akers*, 364 So. 3d 662, 670 (¶22) (Miss. Ct. App. 2021), we explained:

> "[T]his Court does not sit to redetermine questions of fact." *Johnson v. Black*, 469 So. 2d 88, 90 (Miss. 1985). "The chancellor is the finder of fact, and the assessment of witness credibility lies within his sole province." *Darnell v. Darnell*, 234 So. 3d 421, 424 (¶8) (Miss. 2017) (brackets and quotation marks omitted). **"Where there is conflicting testimony, the chancellor, as the trier of fact, is the judge of the credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation."** *Bowen v. Bowen*, 982 So. 2d 385, 395 (¶42) (Miss. 2008) (quotation marks omitted). "This Court will not substitute its judgment for that of the chancellor even if this Court disagrees with the [chancellor] on the finding of fact and might arrive at a different conclusion." *Sanderson v. Sanderson*, 170 So. 3d 430, 434 (¶13) (Miss. 2014).

(Emphasis added). There was certainly conflicting testimony in this case. The "assessment of witness credibility lies within [the chancellor's] sole province." *Id*. A review of the record reveals that sufficient evidence existed for the chancellor to have found that a viable relationship between P.J. and Pruwitt existed and that Pruwitt had been unreasonably denied visitation.

> **II.     The chancellor's award of grandparent visitation must be reversed because the chancellor failed to analyze or even mention the *Martin* factors.**[8]

¶25.    Concerning the determination of whether grandparent visitation is in the best interest of the child, this Court reasoned in *Bolivar v. Waltman*, 85 So. 3d 335, 338-39 (¶10) (Miss.

---

[8] *Martin v. Coop*, 693 So. 2d 912 (Miss. 1997), *abrogated in part on other grounds by Smith v. Martin*, 222 So. 3d 255 (Miss. 2017).

10

Ct. App. 2012):

> Once the statutory criteria are established, the chancellor must apply the following *Martin* factors to determine appropriate visitation:
>
> 1.   The amount of disruption that extensive visitation will have on the child's life. This includes disruption of school activities, summer activities, as well as any disruption that might take place between the natural parent and the child as a result of the child being away from home for extensive lengths of time.
>
> 2.   The suitability of the grandparents' home with respect to the amount of supervision received by the child.
>
> 3.   The age of the child.
>
> 4.   The age, and physical and mental health of the grandparents.
>
> 5.   The emotional ties between the grandparents and the grandchild.
>
> 6.   The moral fitness of the grandparents.
>
> 7.   The distance of the grandparents' home from the child's home.
>
> 8.   Any undermining of the parent's general discipline of the child.
>
> 9.   Employment of the grandparents and the responsibilities associated with that employment.
>
> 10.  The willingness of the grandparents to accept that the rearing of the child is the responsibility of the parent, and that the parent's manner of child rearing is not to be interfered with by the grandparents.
>
> *Townes v. Manyfield*, 883 So. 2d 93, 95-96 (¶17) (Miss. 2004) (quoting *Martin*, 693 So. 2d at 916). **The Mississippi Supreme Court has explained that "making findings of fact under the *Martin* factors is an integral part of a determination of what is in the best interest of a child."** *Id*. at 97 (¶29) (quoting *T.T.W. v. C.C.*, 839 So. 2d 501, 505 (¶12) (Miss. 2003)). **Because of the "integral" nature of these findings, our supreme court specifically instructs that "the Martin factors are to be applied and discussed *in every case* in which grandparent visitation is an issue."** *Id*.

(Italic emphasis in original) (bold emphasis added). *Bolivar* goes on to explain that "[b]ecause chancellors are required to make specific findings on the *Martin* factors in *every* case involving grandparent visitation, the supreme court has vacated grandparent-visitation awards unsupported by such findings." *Id*. at 339 (¶13).

¶26. The chancellor did not mention the *Martin* factors in her ruling from the bench on May 31, 2023, and did not address any of the factors in the written order filed on June 14, 2023. While McDonald argued the court failed to address the *Martin* factors in his Rule 59 motion, the chancellor again failed to address the factors in her ruling from the bench on October 30, 2023, or in the order denying the motion entered on December 1, 2023. Because the chancellor failed to make specific findings regarding the *Martin* factors, we must reverse and remand for the chancellor to fully discuss findings regarding those factors to determine what is in the best interest of the child in this case and to shape an appropriate visitation schedule.

## CONCLUSION

¶27. As to the chancellor's findings regarding the statutory criteria for grandparent visitation pursuant to section 93-16-3(2), we affirm. However, we reverse and remand for specific findings regarding the *Martin* factors.[9]

¶28. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS,**

---

[9] Upon remand, the chancellor should consider the award of attorney's fees at the trial-court level pursuant to Mississippi Code Annotated section 93-16-3(4) and *Hutson v. Huston*, 385 So. 3d 431 442-43 (¶57) (Miss. Ct. App. 2023). McDonald filed a motion for appellate attorney's fees, which is addressed by separate order.

**McDONALD, LAWRENCE, McCARTY, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**