# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-CA-01739-SCT

*TANYA DALE WRIGHT SANDERSON*

*v.*

*HOBSON L. SANDERSON, JR.*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/19/2016 |
| TRIAL JUDGE: | HON. JOHN ANDREW HATCHER |
| TRIAL COURT ATTORNEYS: | GREGORY M. HUNSUCKER |
| | JAK McGEE SMITH |
| | JANELLE MARIE LOWREY |
| COURT FROM WHICH APPEALED: | MONROE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | ROY O. PARKER |
| ATTORNEYS FOR APPELLEE: | JAK McGEE SMITH |
| | GREGORY M. HUNSUCKER |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 06/07/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., COLEMAN AND MAXWELL, JJ.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1.     This is the second time Tanya Dale Wright Sanderson and Hobson L. "Hob" Sanderson's divorce has ended up before this Court.

¶2.     In *Sanderson v. Sanderson*, 170 So. 3d 430 (Miss. 2014) (*Sanderson I*), this Court agreed with the chancellor that Tanya and Hob's prenuptial agreement was procedurally conscionable.  But we disagreed that potential substantive unconscionability was not a consideration.  We reversed and remanded for the chancellor to weigh Tanya's claim that the

prenuptial agreement was substantively unconscionable. Tanya had also claimed the chancellor erroneously classified as Hob's separate property several assets that had been commingled with marital property. We agreed with Tanya regarding one asset—the couple's joint bank account. And we reversed the chancellor's finding that the joint bank-account funds were not commingled.

¶3. On remand, a different chancellor found the prenuptial agreement was substantively conscionable and thus enforceable. After a detailed ***Ferguson***[1] analysis, the chancellor then awarded Tanya $537.42—the balance of the joint bank account at the time of Tanya and Hob's final separation. Tanya appeals. She first argues the chancellor failed to recognize the prenuptial agreement was unconscionable because the *results* of enforcement are unfair. Alternatively, she argues the chancellor erred by not expanding the scope of commingled marital assets to include Hob's home and investment accounts.

¶4. Upon review, we discern no reversible error. The chancellor's holding the prenuptial agreement was enforceable and his determination the commingled marital assets only encompassed the balance of the joint account are consistent with both ***Sanderson I*** and the terms of the prenuptial agreement. Therefore, we affirm.

**Background Facts and Procedural History**

**I.      Marriage and Divorce**

¶5. Tanya and Hob were cohabiting when they decided to marry in 1994. At the time, Hob was sixty-two and owned a construction business and a home. Tanya was twenty-eight,

---

[1] ***Ferguson v. Ferguson***, 639 So. 2d 921, 928 (Miss. 1994).

worked as a deputy chancery clerk, and owned a home. Both had been married previously. Hob had children from his first marriage who were grown and not living with him, and Tanya had a young daughter with her ex-husband.

¶6. The day before they married, at Hob's insistence, the two entered into a prenuptial agreement. The agreement eliminated all rights to spousal support and entitled each party to keep all separate property acquired not only before but also during the marriage, if traceable. According to Tanya, after she married, she sold her home and quit her job. Tanya raised her daughter in Hob's home, and both she and her daughter lived off Hob's income from his business, saving all child-support payments for her daughter's college education.

¶7. After seventeen years of marriage, Tanya was granted a divorce. The chancellor enforced the prenuptial agreement, granting each party his or her separate property. Relevant to this appeal, the chancellor found six investment accounts in Hob's name remained his separate, nonmarital property and two investment accounts were Tanya's separate property. While the couple had a joint bank account, the chancellor found the funds deposited in this account were completely traceable to Hob's separate assets, so the joint account was merely a "clearinghouse" to facilitate the transfer of funds. The chancellor also found Hob had exclusive title, possession, and control of the house and 320 acres in Aberdeen, Mississippi, where he and Tanya had lived during their marriage. In total, Hob left the marriage with more than $3.5 million in separate property, and Tanya left with approximately $425,000 in separate property.

## II. First Appeal

3

¶8. Tanya appealed. She challenged both the chancellor's determination the prenuptial agreement was enforceable and his application of the agreement to find certain assets, otherwise subject to equitable distribution, remained Hob's separate property.

### *A.      Conscionability*

¶9. Tanya argued the chancellor erred in finding the prenuptial agreement procedurally conscionable, as well as refusing to consider whether the agreement was substantively conscionable. This Court affirmed the chancellor's finding the agreement was procedurally conscionable. *Sanderson I*, 170 So. 3d at 435. But we clarified that, because "a prenuptial agreement is a contract like any other contract," it is "subject to the same rules of construction and application"—including the consideration whether the agreement is substantively conscionable. *Id.* at 436 (citations omitted). Substantive conscionability "looks at the terms of the contract" and "the circumstances existing *at the time the contract was made*." *Id.* at 437 (emphasis in original). We held "that substantive unconscionability feasibly could be measured at the time the prenuptial agreement is made," thus "ensur[ing] that the Court does not 'relieve a party to a freely negotiated contract of the burdens of a provision which becomes more onerous than had originally been anticipated.'" *Id.* (quoting *Mabus v. Mabus*, 890 So. 2d 806, 819 (Miss. 2003)). And we reversed and remanded this case for the chancellor to do so. *Id.*

### *B.      Asset Classification*

¶10. Tanya's other points of error focused on property—its classification and distribution. She argued commingling had converted Hob's separate property into marital assets subject

to distribution.[2] Specifically, she claimed all of Hob's investment accounts were marital property subject to distribution. And the joint account was not a "clearinghouse" but instead the funds deposited into the account were for familial use. She also asserted the chancellor erred when he did not classify the marital home, surrounding acreage, and contents of the marital home as marital property subject to equitable distribution.

¶11. Our opinion in *Sanderson I* only addressed Tanya's commingling claim concerning the joint account. We reversed the chancellor's finding that the account merely served as a "clearinghouse." *Id.* at 437. Instead, we found "the money deposited in the joint account became a marital asset subject to equitable division because of its family use." *Id.* (citing *A&L, Inc. v. Grantham*, 747 So. 2d 832, 838 (Miss. 1999)). Because Tanya had contributed in "disburs[ing] the funds for familial purposes," under Mississippi's law concerning marital property, "her contributions and the familial use to which the money in the joint account was put changed the legal nature of the money in the account from separate property subject to tracing to marital property." *Id.* at 438.

¶12. We concluded that "Tanya and Hob[] could have drafted the prenuptial agreement to address funds for familial use, but they did not." *Id.* (internal citations omitted). So we "reverse[d] the chancellor's finding that the joint bank account funds were not commingled." *Id.*

¶13. "After due consideration of the other issues raised," we "discern[ed] no other errors." *Id.*

---

[2] She also argued the couple's joint tax returns were further evidence of commingling.

### III. Remand

#### A. *Conscionability*

¶14. Due to the passing of the original chancellor, another chancellor was assigned this case on remand. He first tackled the "main remanded issue"—whether the prenuptial agreement was substantively conscionable. He rejected Tanya's assertions that the true test of fairness was to compare what she would have received had there been no prenuptial agreement to what she would receive if the agreement is enforced. He also rejected Tanya's request to apply caselaw from other jurisdictions and reach the same result. Instead, he considered the agreement's terms and the circumstances at the time the agreement was formed. *See Sanderson I*, 170 So. 3d at 438. And he concluded the terms were mutual and the circumstances were not so unfair and one-sided to make the agreement unconscionable.

#### B. *Equitable Distribution*

¶15. By separate order, the chancellor then addressed the more "limited" issue of the commingled joint bank account. On remand, Tanya had argued that Hob's investment accounts and home fell into the scope of marital assets to be distributed, based on commingling. But the chancellor found Tanya's "extensive and all-encompassing commingling and familial use claims" were incompatible with the enforceable terms of the prenuptial agreement. While this Court had held funds "kept" in the joint account were marital, the funds Tanya claims were also marital were not kept in the joint account for family use. Instead they were separated out and thus regained the status of separate property under the prenuptial agreement. *See Johnson v. Johnson*, 650 So. 2d 1281, 1286 (Miss.

6

1994) (holding timber-sale proceeds, generated by wife's separate estate, though commingled in the family account, "reacquired" their nonmarital status when the funds were transferred back to the wife).

¶16.   Moreover, in the first appeal, Tanya had challenged the original chancellor's classification of these specific assets, based on the exact same commingling arguments. And this Court affirmed the chancellor's classification except for the joint account. So based on the language of *Sanderson I* and the prenuptial agreement, the chancellor concluded his authority on remand was limited to distributing the balance of the joint account, which was $537.42 at the time of final separation.

¶17.   The chancellor then went through a detailed *Ferguson* analysis. *See Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994). He noted, had all the money deposited into the joint account been "kept" there, he would have to consider how much money went to Tanya and her daughter—almost $95,000. Another equitable consideration would be the more than $200,000 in court-ordered temporary support Tanya received during the divorce proceedings that she otherwise was not entitled to under the prenuptial agreement. In total, there was more than $305,000 in credits and set-offs the chancellor would have to consider, if the marital estate was as large as Tanya claimed.[3]

¶18.   Because, however, the only asset to be distributed on remand was the $537.42 in the joint account at the time of separation, the chancellor awarded it to Tanya.

---

[3] According to the second chancellor, had the marital estate been as large as Tanya claimed, it would have been valued at approximately $1.5 million—or $750,000 each, if divided equally.

¶19. With all issues on remand being finally resolved, the chancellor's post-remand judgments became final and appealable.

## IV. Second Appeal

¶20. Tanya again has appealed. She raises seven points of error,[4] which we have condensed into two questions:

(1) Did the chancellor err in ruling the prenuptial agreement was substantively conscionable?

---

[4] Tanya's seven issues on appeal are, verbatim:

(1) Whether the trial court erred in finding the prenuptial agreement entered into by the parties on July 21, 1994, was substantively conscionable.

(2) Whether the trial court erred in only considering the balance of the joint account when the parties separated, instead of the investments and other assets purchased with money from the joint account, which converts those investments and assets to commingled marital property.

(3) Whether the trial court erred in not hearing the complaint regarding Hob cutting and selling timber from the marital homestead, in spite of an existing Lis Pendens, prior to the trial court deciding on whether the prenuptial agreement was substantively conscionable. The trial court ruled on the motion even though it was not even considered until the final order.

(4) Whether the trial court erred in its interpretation of the Supreme Court's order.

(5) Whether the trial court erred in assessing the credibility of trial witnesses.

(6) Whether the trial court erred in granting offset of the spousal support and use of the marital home to Hob in figuring the equitable distribution of marital assets, even though Tanya was entitled, by law, to the standard of living she was accustomed to, including the spousal support and use of the marital home.

(7) Whether the trial court erred by not using Chancellor Littlejohn's Classification of Assets to determine what Tanya was entitled to in the equitable distribution of assets.

8

(2)  Did the chancellor err in categorizing the funds left in the joint account as the only marital asset to be distributed?[5]

**Discussion**

¶21.  This Court reviews the chancellor's decision that the prenuptial agreement is enforceable for abuse of discretion. *Sanderson I*, 170 So. 3d at 434 (citing *Mabus*, 890 So. 2d at 810).  We apply a similarly limited standard of review to the chancellor's ruling on property division and distribution.  *Id.* (citing *Owen v. Owen*, 798 So. 2d 394, 397 (Miss. 2001)).  With this deferential standard of review in mind, we discern no post-remand abuse of discretion.

**I.    Substantive Conscionability**

¶22.  In Tanya's first appeal, this Court held the prenuptial agreement was *procedurally* conscionable. *Sanderson I*, 170 So. 3d at 435.  So the only question on remand was whether it was *substantively* conscionable as well.  *Id.* at 436-37.  "Substantive unconscionability

---

[5] This opinion does not address Tanya's Issues 3, 5, 6, and 7.

Issue 3—"Whether the trial court erred in not hearing the complaint regarding Hob cutting and selling timber from the marital homestead"—is outside the scope of this Court's remand in *Sanderson I*, which did not disturb the chancellor's classification the of "marital homestead" as Hob's separate property.

And as for Issues 5 through 7, Tanya cites no authority to support her positions.  So these issues are waived.  *Tyler v. Auto. Fin. Co.*, 113 So. 3d 1236, 1242 (Miss. 2013) (citations omitted).  Further, for Issue 5—witness credibility—the law is clear that the chancellor "is in a better position than this Court to judge the veracity of witnesses and credibility of evidence." *Lee v. Lee*, 798 So. 2d 1284, 1291 (Miss. 2001).  For Issue 6, Tanya does not attack the chancellor's equitable consideration of the more than $200,000 in court-ordered spousal support and court-ordered use of Hob's home as an error of law.  Rather, she merely urges this point as evidence of the second chancellor's alleged bias against her.  And, finally, for Issue 7, the second chancellor specifically stated he was basing his property award on the prior chancellor's classification, as modified by *Sanderson I*.  And Tanya fails to cite any record evidence contradicting this assertion.

9

occurs when the terms of the agreement are so one-sided that no one in his right mind would agree to its terms." *West v. West*, 891 So. 2d 203, 213 (Miss. 2004). *See also Smith v. Express Check Advance of Miss., LLC*, 153 So. 3d 601, 607 (Miss. 2014) ("An unconscionable contract is one such as no man in his senses and not under a delusion would make on the one hand, and as no honest and fair man would accept on the other."). So, in contrast to procedural unconscionability, which "deals with the formation of the contract," substantive unconscionability focuses on the fairness of the agreement's *terms*. *McLeod v. McLeod*, 145 So. 3d 1246, 1249 (Miss. Ct. App. 2014) (citing *West*, 891 So. 2d at 213). *See also Sanderson I*, 170 So. 3d at 437 ("Unconscionability looks at the terms of the contract.").

## A.    Prenuptial Agreement's Terms

¶23.    Here, the chancellor held that the terms of the prenuptial agreement were not so harsh, fundamentally unfair, oppressive, or one-sided as to render the agreement in whole or in part substantively unconscionable. Instead, the agreement "treats both parties the same and contains mutual terms." We agree. Under the agreement, "each" party "shall separately retain all rights in his or her own property, . . . whether now owned or hereafter acquired," "each shall have and maintain, regardless of circumstances or change of circumstances, the absolute and unrestricted right to dispose of and maintain use and retain the use and ownership of such separate property," and "each party waives and releases all rights, statutory or otherwise, in and to the other's property . . . ." Further, both Tanya and Hob

10

waived all rights to statutory allowances, alimony, intestate distribution, will renunciation, and employment benefits sharing. So the terms of the agreement are not one-sided.[6]

### B. Post-Agreement Results

¶24. Tanya asserts, however, it is not the *terms* of the agreement that should be the Court's focus. Rather, this Court must consider the *consequences* of enforcing the agreement and her resulting financial circumstances.

#### 1. Comparing Agreement Enforcement to Equitable Distribution

¶25. Tanya first argues the chancellor erred by not considering what she would receive if the prenuptial agreement is enforced versus if there was no prenuptial agreement. According to her, this disparity makes the prenuptial agreement unconscionable. The chancellor rejected this results-based analysis. And so do we.

¶26. To support her argument, Tanya cites ***In re Johnson's Will***, 351 So. 2d 1339 (Miss. 1977). But that case concerned a *post*-nuptial agreement, not a prenuptial one. So in ***Johnson's Will***, at the time the wife signed the agreement to not contest her husband's will, she had statutory inheritance rights. And she gave up these rights when she signed the post-nuptial agreement. ***Id.*** at 1340. So when considering the fairness of the agreement, this Court found it was necessary to compare what the wife would have received if she had been

---

[6] In fact, the one nonmutual provision actually *favored* Tanya. If Hob had died during the first year of marriage, Tanya would have received $50,000. And if he had died after a year of marriage, she would have received $100,000. But if Tanya had died during the first year of marriage, Hob would have received only $10,000, and after the first year of marriage, only $20,000.

11

able to renounce the will and take her statutory widow's share versus if the agreement not to renounce the will was enforced. *Id.* at 1342.

¶27. Here, by contrast, Tanya was *not* Hob's wife when she signed the prenuptial agreement. So at the time of entering the agreement, she had no right to the equitable distribution of the marital estate, because at that time there was no marriage.[7] And without the prenuptial agreement, there would be no marriage. So, unlike the widow in *Johnson's Will*, this Court cannot compare what Tanya would have received as Hob's wife if there was no prenuptial agreement.

¶28. Instead of *Johnson's Will*, the factually similar case we look to for guidance is *McLeod*. Just months before *Sanderson I*'s explicit holding that a prenuptial agreement must be both procedurally and substantively conscionable, the Mississippi Court of Appeals considered both aspects of conscionability when deciding to enforce a prenuptial agreement. *McLeod*, 145 So. 3d at 1252-53. And the court reversed the chancellor's holding that the prenuptial agreement was substantively unconscionable. The chancellor had made the same comparison that Tanya asks this Court to make. He concluded the agreement was unconscionable because it did not provide the wife any portion of her husband's estate in the event of divorce, whereas, "under the laws in Mississippi, without a prenuptial [agreement]

---

[7] Tanya claims that, because she and Hob cohabited prior to marrying, she and Hob were "de facto husband and wife." But Mississippi has refused to acknowledge common-law marriages for more than sixty years. Miss. Code Ann. § 93-1-15 (Rev. 2013). And instead of conveying marital rights, cohabitation is a statutory crime. Miss. Code Ann. § 97-29-1 (Rev. 2014).

12

Jeanell would be entitled to an equitable share of the marital estate at the time of divorce." *Id.* at 1252.

¶29. The Court of Appeals rejected this comparison, because the fact Jeanell would not be entitled to an equitable distribution was the *entire point* of the prenuptial agreement. "By signing the agreement, Jeanell acknowledged that she knew that if she and Willie divorced, she relinquished any potential claims to Willie's property" and "would leave with the few assets she brought into the marriage." *Id.* at 1253. In other words, Jeanell got what she bargained for. And "[i]t is not now and never has been the function of this Court to relieve a party to a freely negotiated contract of the burdens of a provision which becomes more onerous than had originally been anticipated." *Id.* (quoting *Estate of Hensley v. Estate of Hensley*, 524 So. 2d 325, 328 (Miss. 1988)).

¶30. As in *McLeod*, here, equitable distribution upon divorce was never an option for Tanya, because, without the prenuptial agreement contractually dictating property rights upon divorce, Hob and Tanya would not have married. So the chancellor did not err when he rejected Tanya's comparative analysis.

*2.    Comparing Tanya's Separate Property to Hob's*

¶31. Nor did the chancellor err when he rejected Tanya's other result-based argument, in which she compared her separate property to Hob's.

¶32. Tanya argues the prenuptial agreement is unconscionably one-sided because it protects Hob's substantial amount of separate property, while providing her with essentially nothing. According to Tanya, after they married, Hob had promised to take care of her. And he

13

encouraged her to sell her own house and stop working, ensuring she has no separate assets. So because she spent her seventeen-year marriage, in her own words, "100% dependent upon Hob's largesse," the prenuptial agreement is substantively unconscionable.

¶33. Claiming Mississippi's "law regarding prenuptial agreements is so unsettled," Tanya asserts that "well established precedent from similar jurisdictions is necessary for guidance on this issue." Tanya argues that a decision from the Missouri Court of Appeals, *Potts v. Potts*, 303 S.W.3d 177 (Mo. Ct. App. 2010), is most on point and should control. Like the Sandersons, Raymond and Susan Potts signed a prenuptial agreement the day before they married. And like the Sandersons', the Pottses' prenuptial agreement provided the parties keep as separate both the property they each brought into the marriage *and* the property they each separately acquired during the marriage and kept titled as separate. The Missouri court held the agreement was substantively unconscionable, because Raymond Potts had been the only party to come into the marriage "with assets that would generate future assets"—i.e., his business. *Id.* at 189 (emphasis removed). And the agreement allowed him to keep and protect as his separate property any income generated from his business that would otherwise have become marital by titling and holding the new property in his name. *Id.* Thus, in the court's view, "[t]he agreement, by its terms, allowed Raymond to generate a large estate of non-marital property while limiting the distribution to Susan (upon dissolution) exclusively to a formula to be in lieu of maintenance, even after a twenty year marriage in which Susan had devoted her efforts to raising the children and running the household and thereby supporting Raymond's business." *Id.* at 190.

14

¶34.    Zeroing in on the provision in their prenuptial agreement that allowed both Hob and Tanya to retain as separate any after-acquired property, Tanya asserts her agreement with Hob is equally unconscionable, because only Hob generated assets during their marriage. However, though there are factual similarities between this case and *Potts*, there are also important differences.

¶35.    First, integral to the Missouri court's holding that the prenuptial agreement was unenforceable was the court's finding of *procedural unconscionability*—something this Court in *Sanderson I* specifically held was not present in this case.  But the bigger problem with applying *Potts* is Tanya's reasoning—that what happened *after* she entered the prenuptial agreement justifies not enforcing it.   When determining unconscionability, circumstances do matter.  *Sanderson I*, 170 So. 3d at 437.  But it is the "circumstances existing *at the time the contract was made*" that the court must consider—not the circumstances at the time of divorce.  *Id.*  (emphasis in original).

¶36.    What Tanya claims is unfair is that, after she married, she sold her house and stopped acquiring separate property through an income.  In other words, she asks this Court to find the prenuptial agreement is unenforceable  because the "burdens of a provision" have turned out by her own actions to be "more onerous than [she] had originally anticipated"—something this Court has refused to do.  *Id.* (quoting *Mabus*, 890 So. 2d at 819).  *See also Hensley*, 524 So. 2d at 328.

¶37.    In *Sanderson I*, this Court specifically directed the chancellor on remand to measure substantive unconscionability "at the time the prenuptial agreement is made[.]" *Sanderson I*,

15

170 So. 3d at 437. So, as mandated in that opinion, the chancellor on remand measured conscionability at the time the prenuptial agreement was made, focusing on the terms and the circumstances at the time the contract was made, and not the consequences seventeen years later.

¶38. At the time the prenuptial agreement was made, Tanya had a significant asset—a house—and a job. True, her assets and asset-generating ability were much smaller than Hob's. But since Tanya has asked this Court to look to other jurisdictions for guidance, the Supreme Court of Georgia has held a prenuptial agreement is "not rendered unconscionable just because it 'perpetuated the already existing disparity between the parties' estates.'" *Mallen v. Mallen*, 622 S.E.2d 812, 817 (2005) (quoting *Adams v. Adams*, 603 S.E.2d 273, 275 (Ga. 2004)). Similarly, the Iowa Supreme Court has recognized "premarital agreements are typically financially one-sided in order to protect the assets of one prospective spouse." *In re Marriage of Shanks*, 758 N.W.2d 506, 516 (Iowa 2008). And "[c]ourts must resist the temptation to view disparity between the parties' financial circumstances as requiring a finding of substantive unconscionability." *Id.* Turning to our own precedent, in *Mabus v. Mabus*, we upheld a prenuptial agreement protecting the separate estates, even though the wife's estate was smaller. And in doing so, it specifically rejected the claim that the estates were "so disparate that it questions fundamental fairness[.]" *Mabus*, 890 So. 2d at 821.

¶39. Again, a substantively unconscionable prenuptial agreement is one with "terms . . . so one-sided that no one in his right mind would agree to it[]." *West*, 891 So. 2d at 213. Here, both Hob and Tanya had been divorced previously and had children from their prior

16

marriages. So it makes sense that each would want to keep their separate property separate both for themselves and their heirs.[8] *See Farris v. Farris*, 202 So. 3d 223, 234 (Miss. Ct. App. 2016) (enforcing prenuptial agreement that, "[i]n substance, . . . simply provided that neither Becky nor Gene—who were both in their sixties, had been married and divorced previously, and had grown children—would 'make a claim against the other for their separate properties including any additional separate properties acquired, whether by means of purchase, gift, inheritance or other means'"). The agreement they entered, though protecting estates of different sizes, did so with provisions that applied mutually to both parties. *See Mabus*, 890 So. 2d at 821 (upholding prenuptial agreement that mutually protected separate estates of different sizes); *McLeod*, 145 So. 3d at 1252-53 (same). Though Tanya claims she did not know the full extent of Hob's property, she knew through premarital cohabitation that his assets and income-generating ability were larger than hers. *See Farris*, 202 So. 3d at 233 (holding that, because wife had cohabited with her husband for three years prior to marriage, "[t]here is no question that Becky was aware of Gene's assets"). And "[b]y signing the agreement, [Tanya] acknowledged that she knew that if she and [Hob] divorced, she relinquished any potential claims to [Hob's] property" and "would leave with the few assets she brought into the marriage." *McLeod*, 145 So. 3d at 1253.

¶40. In the end, the premarital agreement "has done exactly what it was intended to do"—allowed the parties to keep all separate property acquired before or during the

---

[8] We also note that during the marriage, Tanya used solely marital property to support herself *and* her daughter. Hob agreed to allow Tanya to save the more than $200,000 in child-support payments for her daughter's college education.

17

marriage. *Mabus*, 890 So. 2d at 821. Thus, as in *Mabus*, we will not judicially set it aside for being unconscionable. Instead, we affirm the chancellor's holding that the prenuptial agreement—in addition to being procedurally conscionable—was substantively conscionable as well.

## II. Equitable Distribution

¶41. We also affirm the chancellor's equitable distribution of the one marital asset—the balance of the joint banking account.

¶42. Tanya takes exception to the chancellor's finding that only the balance of the joint bank account was subject to equitable distribution on remand. Instead, she asserts that further commingling with joint account funds, which *Sanderson I* held became marital through family use, transformed the home where she and Hob lived and Hob's separate investment and banking accounts into marital assets subject to equitable distribution.

### A. Prenuptial Agreement

¶43. The chancellor rejected Tanya's "extensive and all-encompassing commingling and familial use claims" as "unenforceable and inequitable." Because the parties clearly intended through the prenuptial agreement to keep their separate property separate, the chancellor found there was "no way the scope of equitable distribution, as sought by [Tanya,] can be granted." Relying on Court of Appeals precedent, *Long v. Long*, 928 So. 2d 1001, 1003 (Miss. Ct. App. 2006), the chancellor found Tanya's request to expand the scope of marital assets based on commingling was incompatible with the clear language of the enforceable prenuptial agreement. We agree.

18

¶44.    At first blush, Tanya's argument appeared valid.  For if the funds *deposited into* the joint account became marital, what about the funds *transferred out*?  But in delving into Tanya's argument on remand and in her second appeal, it becomes apparent that Tanya made no real attempt to trace familial-use funds out of the joint account.  Instead, she has cited commingling cases broadly as her reason for why Hob's investment accounts and home are marital.  Like the chancellor on remand, we find Tanya's argument to be so overbroad that it can only be seen as an attempt to circumvent the clear terms of the enforceable prenuptial agreement.

¶45.    As Tanya views "commingling," not only did "the money deposited into the joint checking account bec[o]me a marital asset subject to equitable division because of its familial use,"[9] but so did everything that came into contact with this money.  In other words, it is not just the increased equity in Hob's home that came from improvements paid for through joint account funds but *the entire home* that became marital.  And since the home was marital, she further reasons the proceeds from the timber cut from the land the home sits on became marital.  Further still, because those proceeds were deposited in the residential maintenance account, then that account became marital. Regarding Hob's separate accounts, Tanya does not point to what portion is attributable to Hob's separate property and what portion represents joint-account funds.[10]  Instead, as best we can understand, her argument

---

[9] *Sanderson I*, 170 So. 3d 437.

[10] A good example involves the $50,000 transferred from the joint account in March 2002 into Hob's Smith Barney account, ending in 2803.  Tanya does not rely on this transfer to argue the $50,000, plus interest, was marital and subject to distribution.  Indeed, this account was not one of the investment accounts the first chancellor awarded to Hob as his

19

is that all of Hob's separate income from his business became marital because it was designated primarily for family use. Thus, *any* account containing Hob's separate income became marital. And any account containing funds from those accounts likewise became marital.[11]

¶46.    In other words, Tanya's argument completely ignores the prenuptial agreement's clear language that "any property hereinafter acquired by each that shall be traceable to proceeds or appreciation from their separate property shall . . . be free from any claim of the other that may arise by reason of the contemplated marriage." Instead, she tries to use the joint account as a wedge to open the door to the entire value of the home and all of Hob's accounts being marital—without explaining how these assets were "not acquired as a result of the separate property" and not "traceable to proceeds or appreciation from their separate property" and thus fell outside the scope of the prenuptial agreement. *Sanderson I*, 170 So. 3d at 432 (quoting the Sandersons' prenuptial agreement).

¶47.    In *Long*, the chancellor decided not to enforce the prenuptial agreement based on commingled property, which the agreement had not addressed. *Long*, 928 So. 2d at 1003. The Court of Appeals reversed, holding the chancellor in error for failing to enforce the

_____

separate property. And there is no indication in the record or from Tanya's argument what happened to this account. Instead, Tanya relies on the $50,000 transfer to support her wider position that money from the joint account was commingled with Hob's investment accounts, converting *all* funds in *all* accounts into marital assets.

[11] Another example is Tanya's claim that the "Church Bonds Flow Chart" is marital. The joint bank account is nowhere to found on this chart. Instead, as far as can be determined, Tanya claims all the accounts on the chart are marital, based on commingling upon commingling.

20

agreement. *Id.* Based on the language of the agreement, the parties clearly intended their separate property to remain separate. Thus, it was error for the chancellor to award the wife a portion of the marital home, which was built using funds the husband received from an eminent domain proceeding condemning his premarital, separate home. *Id.*

¶48. Here, the chancellor rightly recognized, based on the language of the Sandersons' prenuptial agreement, the parties clearly intended that assets traceable to their separate property were to remain separate. And he found Tanya's overly broad commingling argument would have rendered this clear provision meaningless. Because the chancellor's decision was based on a reasonable application of the prenuptial agreement, we find no abuse of discretion.

### B.     Sanderson I

¶49. Not only was the chancellor's limitation of the marital assets to the funds remaining in the joint account at the time of separation consistent with the clear terms of the prenuptial agreement, it was also rooted in *Sanderson I*. The chancellor's reasoning was two-fold. First, *Sanderson I*'s holding was specific—"certain funds, used for familial purposes, kept in a joint bank account created after the marriage began do not fall within the parameters of the prenuptial agreement." *Sanderson I*, 170 So. 3d at 432. Second, *Sanderson I*'s holding did not include reversing the prior chancellor's classification of Hob's home and investment accounts as marital—even though Tanya had raised the exact same commingling arguments in her *Sanderson I* briefs, as she did on remand.

21

¶50.    The chancellor was right on both counts.  Tanya raised *the exact same commingling*

*arguments* in **Sanderson I** regarding Hob's home and investment accounts as she did on

remand and in this second appeal.  And while we acknowledged these raised points of error,

we addressed only the joint bank account and the chancellor's "clearinghouse" finding.[12] *See*

**Sanderson I**, 170 So. 3d at 437-38.  The joint bank account was the only asset we held had

been wrongly classified by the chancellor.  *Id.* at 438.  The opinion began by holding "that

certain funds, used for familial purposes, *kept* in a joint bank account created after the

marriage began, do not fall within the parameters of the prenuptial agreement."  *Id.* at 432

(emphasis added).  Section III of the discussion specifically held "that the money deposited

into the joint checking account became a marital asset subject to equitable division because

of its familial use."  *Id.* at 437.  And the opinion concluded by "revers[ing] the chancellor's

finding that the joint bank account funds were not commingled."  *Id.* at 438.

¶51.    Significantly, we did not address whether potential *further* commingling may have

occurred based on finding that the joint account was marital through the familial-use

doctrine.  Nor did we direct the chancellor to consider Tanya's arguments that other assets

had been commingled, in light of its holding.[13]

---

[12] Section III of the opinion begins by noting that "Tanya argues the chancellor improperly found certain assets not commingled for purposes of making an equitable distribution of marital property. Included in the charge of error is a joint bank account." **Sanderson I**, 170 So. 3d at 438.

[13] Instead, the opinion merely stated, "After due consideration of the other issues raised, we discern no other errors." *Id.*

22

¶52. As the chancellor noted, this Court could have reversed and remanded the original chancellor's finding that the marital home and Hob's investment and banking accounts were his separate property but did not. Thus, the second chancellor reasonably concluded that Tanya's request to reclassify these assets as marital was outside the scope of remand. And we find no abuse of discretion in the chancellor's following this Court's specific holding "that certain funds, used for familial purposes, kept in a joint bank account created after the marriage began, do not fall within the parameters of the prenuptial agreement" and thus were subject to equitable distribution. *Id.* at 432.

**Conclusion**

¶53. Because the prenuptial agreement is enforceable as substantively conscionable, and because, under the prenuptial agreement, as interpreted by *Sanderson I*, the only asset not subject to the agreement was certain funds kept in a joint bank account, the chancellor did not abuse his discretion on remand. We therefore affirm.

¶54. **AFFIRMED.**

**WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., KING, COLEMAN, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR.**

23