# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00789-COA

THE ESTATE OF CHARLES JAMES BELL, JR.          APPELLANT

v.

THE ESTATE OF SARAH DELL MANN BELL,          APPELLEES
NITA JEAN SIMPSON HENRY, LIDELL MANN
SIMPSON, JAMES ROBERT HENRY, IN HIS
CAPACITY AS TRUSTEE OF THE DELL MANN
TRUST #1, AND DELL MANN PROPERTIES,
LLC

| | |
|---|---|
| DATE OF JUDGMENT: | 06/14/2021 |
| TRIAL JUDGE: | HON. VICKI B. DANIELS |
| COURT FROM WHICH APPEALED: | MONTGOMERY COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JAMES WILBOURN VISE |
| | G. MICHAEL MASSEY |
| ATTORNEYS FOR APPELLEES: | MATTHEW THOMPSON |
| | CHAD KENNETH KING |
| | FLOYD M. MELTON III |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 02/21/2023 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**GREENLEE, J., FOR THE COURT:**

¶1. The Estate of Charles James Bell Jr. appeals from the Montgomery County Chancery Court's judgment enforcing an antenuptial agreement between Charles and Sarah Dell Mann Bell. Charles's estate reiterates his claims that (1) the antenuptial agreement was a testamentary instrument that Sarah revoked when she executed a subsequent will; (2) Sarah's subsequent will was automatically renounced by operation of law because it did not include

an adequate provision for him; (3) the agreement was substantively unconscionable; and (4) there was no consideration for the agreement. Finding no error, we affirm the chancery court's judgment.

## FACTS AND PROCEDURAL HISTORY

¶2. Sarah and Charles were both sixty-two years old at the time of their May 9, 1987 wedding. Charles had two adult children from a previous relationship. Sarah had never been married. Although she did not have any children, she had a close relationship with her niece and nephew, Nita Henry and Lidell Simpson. They were the adopted children of Sarah's sister and brother-in-law, Bonnie and Samuel Simpson.

### A. Antenuptial Agreement

¶3. Eight days before their wedding, Sarah and Charles signed an antenuptial agreement.[1] According to the two-page, four-paragraph agreement, Sarah and Charles "desire[d] that all property now owned or hereafter acquired by each of them shall, for testamentary disposition, be free from any claim of the other that may arise by reason of their contemplated marriage." The agreement also contained the following provision:

> After solemnization of the marriage between the parties, each of them shall separately retain all rights in his or her own property, whether now owned or hereafter acquired, and each of them shall have the absolute and unrestricted right to dispose of such separate property, free from any claim that may be made by the other by reason of their marriage, and with the same effect as if no marriage had been consummated between them.

---

[1] The agreement was drafted on March 31, 1987. Bonnie and Samuel witnessed its execution. The parties disagree regarding the author of the agreement.

2

Charles and Sarah further agreed to waive "any rights as surviving spouse to elect to take against the other's will, whether heretofore or hereafter made." According to the agreement, that provision was meant to be "a waiver and release of the right of election in accordance with the requirements of Section 91-5-25 of the Mississippi Code of 1972,[2] or of the same or similar law of any other jurisdiction which may be applicable."

¶4.     Additionally, the agreement stated that "each of the parties owns, individually, real and personal property, [and] the nature and extent of the holdings of each party having been disclosed to the other[.]" The record indicates that Sarah owned approximately nine parcels of real property, brokerage accounts, and bank accounts when she signed the antenuptial agreement. The nine parcels of real property included approximately 187 acres of land. Charles had a schoolteacher's pension, retirement benefits, and a home on approximately

---

[2] Mississippi Code Annotated section 91-5-25 (Rev. 2021) provides:

When a husband makes his last will and testament and does not make satisfactory provision therein for his wife, she may, at any time within ninety (90) days after the probate of the will, file in the office where probated a renunciation to the following effect, viz.: "I, A B, the widow of C D, hereby renounce the provision made for me by the will of my deceased husband, and elect to take in lieu thereof my legal share of his estate." Thereupon she shall be entitled to such part of his estate, real and personal, as she would have been entitled to if he had died intestate, except that, even if the husband left no child nor descendant of such, the widow, upon renouncing, shall be entitled to only one-half (½) of the real and personal estate of her deceased husband. The husband may renounce the will of his deceased wife under the same circumstances, in the same time and manner, and with the same effect upon his right to share in her estate as herein provided for the widow.

3

fifteen or sixteen acres of land.[3] After the marriage, Charles moved into the home that Sarah had inherited from her father.

### B. Sarah's Last Will & Testament

¶5. On December 8, 2004, Sarah executed a will. Through it, she appointed Bonnie as the executrix.[4] Sarah left Bonnie her home and the approximately fourteen acres of adjoining property. If Bonnie predeceased Sarah, then the property would go to Nita and Lidell, to "share and share alike, per st[ir]pes." Sarah's will also contained the following request:

> I would make a request, but not an absolute directive of my sister or my nephew and niece, that should my husband, Charles James Bells, [sic] Jr., survive me, that he be allowed to live in the said residence as long as he desires and it is acceptable to my heirs.

¶6. Sarah left her residuary estate to an irrevocable trust named "The Dell Mann Trust #1." She appointed Nita's husband James Henry as the trustee, and she gave him absolute discretion to accumulate or distribute the income from the trust and invade it for the benefit of Bonnie, Samuel, or any of their natural or adopted descendants.

¶7. Sarah and Charles lived together in the marital home until June 2012 when Sarah was moved into an assisted living facility.[5] Charles asserts that Nita, James, and "others" forced

---

[3] According to Charles's estate, Charles sold his home and property to provide for Sarah and pay half of the expenses for the marital home.

[4] If Bonnie was unable to act as the executrix of Sarah's estate, then Bonnie's husband Samuel was to replace her. If Samuel was also unable or unwilling to serve as the executor then Nita's husband James would act as the executor.

[5] Nita disputed Charles's claim that Sarah was immediately moved into an assisted living facility. Nita said that she and James moved Sarah into their home.

4

Sarah to move against her wishes. In contrast, Nita said Sarah was moved due to her declining health and Charles's mistreatment. In any event, Sarah signed a warranty deed on July 18, 2012. Through it, she transferred her one-half interest in the nine parcels of Carroll County property to Dell Mann Properties LLC.

¶8. Charles continued to live in the marital home until 2013. At that time, Charles's son William Bell moved Charles to a separate living facility due to Charles's declining health. In April 2015, Sarah and Charles executed a warranty deed and sold the marital home.[6]

### C. Petition to Probate Sarah's Estate

¶9. Sarah died in March 2017. Approximately two months later, James filed a petition to probate Sarah's will.[7] William immediately entered his appearance as Charles's attorney. The chancery court entered an order appointing James as the executor of Sarah's estate. Charles subsequently moved to set aside the order appointing James as the executor. James filed a response in opposition and attached a copy of the 1987 antenuptial agreement.[8]

¶10. Charles countered with a petition for a declaratory judgment challenging the antenuptial agreement's validity. According to Charles, the antenuptial agreement was unconscionable, the product of undue influence, and unenforceable as a testamentary

---

[6] William signed the warranty deed as Charles's attorney-in-fact.

[7] Bonnie and Samuel both predeceased Sarah. The will thus appointed James as the executor of Sarah's estate.

[8] After conducting a hearing, the chancery court denied Charles's motion to set aside the order appointing James as the executor of Sarah's estate.

5

instrument. Charles asserted that he and Sarah did not intend to enforce the agreement after they equally divided their marital expenses for the previous twenty-five years. Charles also claimed that the agreement did not include a waiver of his statutory rights set forth in Mississippi Code Annotated section 91-5-27 (Rev. 2021),[9] so Sarah's 2004 will must be renounced as a matter of law because it did not include an adequate provision for him. Charles later filed a separate notice of his renunciation of Sarah's will.

¶11. In August 2017, Nita filed a response to Charles's petition for declaratory judgment.[10] She also filed a counterclaim for a declaratory judgment. She argued that the antenuptial agreement was valid and enforceable. In his answer to Nita's counterclaim, Charles reiterated his claims that the antenuptial agreement was void and unenforceable.

### D. Charles's Petition to Contest and Void Sarah's Will

¶12. In August 2018, Charles filed a petition to contest Sarah's will. Charles alleged that the will was the product of undue influence. He noted that the signature lines on pages one through ten of the will were blank. He reasoned that there was no indication that Sarah had

---

[9] Section 91-5-27 provides:

> If the will of the husband or wife shall not make any provision for the other, the survivor of them shall have the right to share in the estate of the deceased husband or wife, as in case of unsatisfactory provision in the will of the husband or wife for the other of them. In such case a renunciation of the will shall not be necessary, but the rights of the survivor shall be as if the will had contained a provision that was unsatisfactory and it had been renounced.

[10] Nita responded individually as an heir with an interest in the litigation, and Sarah's estate later joined her in her arguments. Nita was represented by the Thompson Law Firm PLLC.

reviewed the substance of those pages. Charles further noted that his and Sarah's last name was misspelled "Bells" in Article I of the will. According to Charles, Sarah would have corrected that mistake if she had actually reviewed the will because she had been a teacher for more than thirty years. Finally, Charles said that Sarah would have never directed that he could only live in the marital home if it was acceptable to her heirs.

¶13. Charles also claimed that the July 18, 2012 warranty deed was the product of James and Nita's undue influence. He said Sarah lacked the mental capacity to execute it. According to Charles, Sarah made several statements evidencing her dementia and lack of capacity to William after she had executed the deed. Charles also stated that Sarah was confused and saddened by her forced separation from him.[11] Charles asked the chancery court to set aside Sarah's will, name him as her sole heir, and set aside the July 18, 2012 warranty deed.

¶14. Nita filed a response to Charles's petition to contest Sarah's will. She asserted several affirmative defenses and again argued that the antenuptial agreement was enforceable. She noted that no one had challenged the agreement until after Sarah's death. Sarah's estate filed a separate response to Charles's petition to contest the will. It essentially tracked Nita's response. Lidell and Dell Mann Properties LLC later filed their own responses.

    E.    *Hearing on the Validity of the Antenuptial Agreement*

¶15. In April 2019, the chancery court conducted a hearing on the validity of the

---

[11] There was no affidavit from Charles supporting his allegations.

7

antenuptial agreement.[12] The parties did not present any witnesses during the hearing. Their attorneys reiterated the arguments that they raised in their earlier pleadings. The chancery court ultimately found that the 1987 antenuptial agreement was valid and a binding contract entered into by two rational mature adults. The chancery court declined to find that the agreement was procedurally or substantively unconscionable. The chancery court noted that the marriage had been consideration for the contract, and Sarah and Charles maintained the right to dispose of their property before or at their death or to leave their respective assets that they had spent a lifetime accumulating to their heirs or whomever they chose. The chancery court further stated that although there was some disparity in Sarah's and Charles's assets at the time, the agreement said that they had each fully disclosed their assets to one another and there was no evidence to the contrary. Thus, the chancery court concluded that Sarah and Charles had waived any right to inherit from each other, including the statutory renunciation of a spouse's will as set forth in section 91-5-27. The court reserved a ruling on the parties' requests for sanctions and attorney's fees and asked that the parties set that matter for another date. On May 15, 2019, the chancery court entered a written order memorializing its bench ruling.[13]

---

[12] In addition to his petition for a declaratory judgment, Charles had also filed a motion to set aside the antenuptial agreement. In that motion, he raised the same arguments that he asserted in his petition for a declaratory judgment.

[13] Charles passed away on August 28, 2020. On December 14, 2020, the chancery court entered an order substituting the Estate of Charles James Bell, Jr. in the place of Charles James Bell, Jr., Deceased. Charles's estate advances the current appeal. For brevity's sake and to avoid confusion with Sarah's estate, we refer to Charles's estate as

¶16.    On June 14, 2021, the chancery court entered its written final judgment denying the parties' motions for attorneys' fees and sanctions. The chancery court also stated that all claims involving Charles's estate had been adjudicated and were finally dismissed. The same day, the chancery court entered a final decree finding that Sarah's estate had been completely administered. The chancery court ratified and approved the final account of Sarah's estate and stated that no further accounting of the executor was required. The chancery court stated that the estate was closed and James was released as executor and discharged from any liability. Any remaining assets were to be transferred to James as trustee of The Dell Mann Trust #1.

¶17.    Charles's estate appeals and argues that the chancery court erred in finding (1) the antenuptial agreement was not a testamentary document that was revoked by Sarah's subsequent will; (2) Sarah's will was not automatically revoked because it did not contain any provision for Charles; (3) the antenuptial agreement was not unconscionable; and (4) there was adequate consideration for the antenuptial agreement.

**STANDARD OF REVIEW**

¶18.    This Court considers a "chancellor's decision of whether to enforce a prenuptial agreement under the abuse of discretion or manifest error standard." *Sanderson v. Sanderson* (*Sanderson I*), 170 So. 3d 430, 434 (¶13) (Miss. 2014). We "will not disturb the findings of the chancellor unless they are manifestly wrong, clearly erroneous, or applied the wrong legal

---

"Charles."

9

standard." *Id*. Contract interpretation and other questions of law are reviewed de novo. *Id*.

## ANALYSIS

### I. The antenuptial agreement was not a testamentary instrument.

¶19. According to Charles, the antenuptial agreement was not a contract—it was a testamentary instrument that Sarah revoked when she executed her 2004 will. Charles's position is based partially on the fact that the agreement contains the following provision: "all property now owned or hereafter acquired by each of [the parties] shall, *for testamentary disposition*, be free from any claim of the other that may arise by reason of their contemplated marriage." (Emphasis added). Charles further claims that the agreement should be considered a testamentary instrument because two people witnessed it, which is a requirement for a valid will as set forth in Mississippi Code Annotated section 91-5-1 (Rev. 2021). And since Sarah's 2004 will revoked all prior "wills and testaments," Charles concludes that Sarah revoked the antenuptial agreement. We disagree.

¶20. This Court previously upheld a chancellor's conclusion that an antenuptial agreement contained a testamentary provision that "expresse[d] [a husband's] intent to leave [a] home to [his daughter.]" *Dixon v. Jones*, 138 So. 3d 205, 208 (¶9) (Miss. Ct. App. 2014). We also upheld a chancellor's conclusion that the husband's subsequent will revoked that testamentary provision because the will contained a provision that contradicted the antenuptial agreement. *Id*. at 210 (¶16). But in this case, the antenuptial agreement did not contain any language purporting to transfer, devise, or bequeath any of Sarah's or Charles's

10

property. Instead, they each retained the right to dispose of their separate property. The fact that two people witnessed the execution of the antenuptial agreement is immaterial as to whether it is a testamentary instrument. The inclusion of the words "testamentary disposition" is likewise immaterial; particularly in the isolated manner in which Charles refers to them. We decline to interpret the antenuptial agreement as testamentary instrument merely because Sarah and Charles waived the right to testamentary distribution of one another's assets. Since the antenuptial agreement was not a testamentary instrument, Sarah did not unilaterally revoke it when she executed her subsequent will.

## II. Charles waived his ability to recover from Sarah's estate.

¶21. Next, Charles argues that the chancery court should have held that Sarah's 2004 will was automatically renounced as a matter of law because Sarah did not leave him anything. As noted above, Sarah and Charles were each sixty-two years old when they married in 1987. Before their marriage, they agreed in writing that they would each "separately retain all rights in his or her own property" and "have the absolute and unrestricted right to dispose of such separate property, free from any claim that may be made by the other by reason of their marriage, and with the same effect as if no marriage had been consummated between them." Consequently, they each "waive[d] and release[d] any rights as surviving spouse to elect to take against the other's will[.]"

¶22. Charles notes that the agreement included an express "waiver and release of the right of election" set forth in section 91-5-25, but it was silent regarding section 91-5-27. He thus

11

reasons that Sarah's 2004 will was automatically revoked as a matter of law because it did not include an adequate provision for him. We disagree.

¶23. "[A]n antenuptial contract is [as] enforceable as any other contract. Accordingly, the same rules of construction and interpretation apply." *Smith v. Smith*, 656 So. 2d 1143, 1147 (Miss. 1995) (citation omitted). "The first rule of interpretation of contracts is to follow the intent of the parties." *Id.* As this Court has noted:

> The Mississippi Supreme Court has set out a three-tiered approach to contract interpretation. First, we attempt to determine "the legal purpose or intent" of the contract based solely on the "four corners" of the contract—that is, based on an objective reading of the words employed in the contract to the exclusion of parol or extrinsic evidence. If the language of the contract is clear and unambiguous, it must be enforced as written. Second, if the terms of the contract are ambiguous, the court should apply the discretionary "canons" of contract construction. Third, only if traditional canons of construction do not resolve the ambiguity, the court should consider extrinsic or parol evidence of the parties' intent.

*Bowman v. Bowman*, 332 So. 3d 317, 321 (¶6) (Miss. Ct. App. 2021) (citations and other internal quotation marks omitted), *cert. denied*, 332 So. 3d 1291 (Miss. 2022).

¶24. As mentioned above, Charles and Sarah agreed that they would each have the unrestricted right to dispose of their own property "free from any claim that may be made by the other *by reason of their marriage*, and with the same effect *as if no marriage had been consummated between them*." (Emphasis added). They clearly intended that neither of them would be able to assert a claim against the other's property by virtue of their marriage. Indeed, any such claim must be considered invalid as though Charles and Sarah had never married one another at all. As a result, it is insignificant that the agreement does not

12

reference section 91-5-27, which only applies—i.e., automatically renounces a will—if the decedent makes no provision for his or her spouse. The existence of a marriage is clearly a prerequisite to the operation of section 91-5-27, and Charles contractually waived his ability to assert any claim against Sarah's estate by virtue of their marriage.

¶25. To the extent that the circumstances could be interpreted as though Charles need not make a claim at all because section 91-5-27 operates automatically on his behalf, that interpretation would lead to absurd and illogical results. In effect, such an interpretation would invalidate any antenuptial agreement if a deceased spouse's will does not adequately provide for the surviving spouse regardless of their clear contractual intent to the contrary. Said differently, it would mean that two prospective spouses could never contractually waive claims against one another's estates because section 91-5-27 automatically raises such claims for them. That would clearly contradict the principle that an antenuptial agreement should be interpreted in a manner, "if possible, as will render all its clauses harmonious, so as to carry into effect the actual purpose and intent of the parties as derived therefrom." *Newell v. Hinton*, 556 So. 2d 1037, 1042 (Miss. 1990); *see also* 41 Am. Jur. 2d *Husband and Wife* § 103 (updated Feb. 2023) ("In interpreting premarital agreements, each term is construed to avoid an effect [that] renders other terms meaningless; a construction [that] attributes a reasonable meaning to all of the provisions of the agreement is preferred to one [that] leaves some of them without function or sense.").

¶26. Construing Charles and Sarah's antenuptial agreement as Charles suggests would

essentially make it useless. It would defy logic for Charles and Sarah to waive their respective abilities to renounce one another's wills while simultaneously allowing for automatic statutory renunciation of the same wills. If that were their intent, there would be no need to prohibit renunciation through section 91-5-25.

¶27. But even assuming for the sake of discussion that automatic renunciation through section 91-5-27 was allowable despite Charles and Sarah's clear intent to the contrary, that would not mean that their antenuptial agreement would become void. Instead, it would just result in the automatic renunciation of Sarah's 2004 will. Charles would still have to assert a claim to recover from Sarah's estate through intestate succession. *See* Miss. Code Ann. § 91-1-7 (Rev. 2013). And the antenuptial agreement would still provide that Charles had relinquished his ability to recover from Sarah's estate as though "no marriage had been consummated between them." Since Charles would be contractually precluded from asserting a claim as Sarah's surviving spouse—because for all such intents and purposes he and Sarah *were never married*—he would still be unable to recover anything from her estate.

¶28. Notwithstanding the hypothetical discussed immediately above, the fact remains that the chancellor correctly interpreted the antenuptial agreement to mean that Charles had waived any renunciation of Sarah's will. By extension, the chancellor correctly found that the antenuptial agreement precluded Charles's ability to recover from Sarah's estate.

**III. The antenuptial agreement was not unconscionable.**

¶29. Charles claims that the antenuptial agreement was substantively unconscionable

14

because he "received nothing in exchange for waiving his statutory right to renounce" Sarah's will. Quoting *In re Last Will & Testament of Johnson*, 351 So. 2d 1339, 1341 (Miss. 1977), Charles further asserts that because Sarah left him nothing in her 2004 will, the 1987 antenuptial agreement was "so one-sided that no one in his right mind would agree to its terms[.]"

¶30.    "The doctrine of unconscionability applies only to the most egregious of contractual situations." *LAGB, LLC v. Total Merch. Servs. Inc.*, 284 So. 3d 720, 727 (¶17) (Miss. 2019). "An unconscionable contract is one such as no man in his senses and not under a delusion would make on the one hand, and as no honest and fair man would accept on the other." *Id.* (internal quotation mark omitted). "The terms of a substantively unconscionable contract are so unreasonably favorable to one party that the contract imposes oppressive terms on the weaker party." *Id.*

¶31.    We disagree with Charles's assertion that the antenuptial agreement was one-sided. *See Sanderson v. Sanderson* (*Sanderson II*), 245 So. 3d 421, 427-31 (¶¶25-40) (Miss. 2018) (holding that a similar prenuptial agreement was not substantively unconscionable merely because of significant disparity in the parties' assets). Indeed, the agreement was equally binding upon Sarah and Charles in that they each waived their ability to recover from the other's separate estate. In other words, "[t]he agreement they entered, though protecting estates of different sizes, did so with provisions that applied mutually to both parties." *Id.* at 430 (¶39). The antenuptial agreement is certainly "not rendered unconscionable just

15

because it perpetuated the already existing disparity between the parties' estates." *Id*. at 430 (¶38). As "it is not now and never has been the function of [an appellate court] to relieve a party to a freely negotiated contract of the burdens of a provision which becomes more onerous than had originally been anticipated[,]" *id*. at 428 (¶29), we do not find that the antenuptial agreement was substantively unconscionable.

**IV.    There was adequate consideration for the antenuptial agreement.**

¶32.    Finally, Charles argues that the antenuptial agreement is invalid for lack of consideration. According to Charles, the chancery court erred when it found that "the marriage of the parties was consideration for" the antenuptial agreement. Charles notes that the word "consideration" is absent from the antenuptial agreement, which says that Sarah and Charles were entering it "by reason of their contemplated marriage." Citing *Flechas v. Flechas*, 791 So. 2d 295, 300 (¶13) (Miss. Ct. App. 2001), Charles asserts that agreement was "in contemplation" of marriage rather than "in consideration" of marriage, so the marriage itself was not the consideration for the agreement. To Charles, "it is unclear what [he] was supposed to get in exchange for waiving his statutory right to renounce [Sarah's] will."

¶33.    "[P]renuptial agreements are enforceable like any other contract." *Sanderson I*, 170 So. 3d at 435 (¶14). "The elements of a contract are (1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract

16

formation." *GGNSC Batesville LLC v. Johnson*, 109 So. 3d 562, 565 (¶6) (Miss. 2013). We agree with the chancellor that the marriage itself was the consideration for the agreement. The agreement specifically states that "the parties to this agreement intend to be married in the immediate future," thus indicating that their imminent marriage was the consideration for the agreement.[14] And although Charles asserts that he received nothing in exchange for waiving his statutory right to renounce Sarah's will, that is patently false: he received a bride, the ability to live in the home that she inherited from her father, and a marriage that lasted for the rest of Sarah's life. He also retained the right to exclude Sarah when he distributed his separate estate. This issue is meritless.

## CONCLUSION

¶34. The chancellor correctly held that the antenuptial agreement was not a testamentary document that Sarah revoked through her subsequent will. We also agree that Charles waived his statutory right to renounce Sarah's will. Additionally, there was consideration for the antenuptial agreement and it was not substantively unconscionable. Accordingly, we affirm the chancery court's judgment.

---

[14] Our Supreme Court has defined consideration for a promise as "(a) an act other than a promise, or (b) a forbearance, or (c) the creation, modification or destruction of a legal relation, or (d) a return promise, bargained for and given in exchange for the promise." *City of Starkville v. 4-County Elec. Power Assoc.*, 819 So. 2d 1216, 1220 (¶10) (Miss. 2002). Thus, an exchange of definite promises, including the promise to marry, qualifies as consideration. *See* Deborah H. Bell, *Bell on Mississippi Family Law* § 23.02[1], at 786 (3d ed. 2020) ("No independent consideration is necessary for a premarital agreement—the parties' mutual promises to marry are sufficient consideration.").

17

¶35.   **AFFIRMED.**

**CARLTON, P.J., LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ.,
CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT
SEPARATE WRITTEN OPINION. McDONALD, J., DISSENTS WITH SEPARATE
WRITTEN OPINION, JOINED BY BARNES, C.J., AND WESTBROOKS, J.**

**McDONALD, J., DISSENTING:**

¶36.   I disagree with the majority's conclusion that Charles James Bell Jr. waived his statutory right to renounce his wife Sarah Dell Mann Bell's will because the parties' antenuptial agreement did not waive their statutory rights under Mississippi Code Annotated section 91-5-27.  Accordingly, I would find that Sarah's 2004 will was renounced because it made no provisions for Charles.  Because the majority finds otherwise, I respectfully dissent.

¶37.   I agree with the majority's assertion that the parties' antenuptial agreement is a contract and, as such, should be interpreted to follow the intent of the parties.  The majority concludes, however, that the general language that Charles and Sarah's agreement contained concerning the parties' rights to dispose of property as if they had not married overrides the specific provisions dealing with the statutory will-renunciation rights that the parties also acknowledged in the antenuptial agreement.  The Mississippi Supreme Court has held that specific provisions of a contract control over more general language in an agreement.  *Harris v. Harris*, 988 So. 2d 376, 379 (¶12) (Miss. 2008).  Here the provision dealing with the parties' statutory rights is separate from other provisions, clearly indicating that the parties were aware of their statutory rights.  Thus, it is logical and not unreasonable to conclude that

18

the parties intended to waive only the provisions of Mississippi Code Annotated section 91-5-25 and not the provisions of section 91-5-27. Although Sarah did not have a will at the time the antenuptial agreement was executed, pursuant to the provisions of the agreement, both she and Charles were aware that statutory provisions could apply if either of them later executed a will. They provided for this possibility and specifically included the waiver of rights under only one of these statutes: section 91-5-25.

¶38. The majority further opines that an interpretation of the contract that provides for the survival of at least one of the statutory renunciation rights of a spouse makes the agreement "useless." However, section 91-5-27 only would operate if one of the parties made a will. Otherwise, the antenuptial agreement was fully enforceable. For example, prior to Sarah's death, Sarah had deeded, by herself, a portion of her timberland to the trust without the need of Charles's agreement or signature. Thus, the agreement was "useful" in that instance.

¶39. Finally, the majority asserts that Charles still would not be entitled to anything because section 91-5-27 renounces Sarah's will, which the majority claims voided the will altogether, leaving Sarah's property to be distributed by intestate succession. Following that logic, the majority claims, the valid antenuptial agreement would bar Charles from claiming any portion of property. However, the automatic renunciation of Sarah's will under section 91-5-27 does not *void* her will; it merely voids whatever Charles was given under the will, causing an adjustment in the will's provision for him. "Renouncement does not affect the validity of the will; it affects only the amount of property which the parties receive–the renouncer as

19

heir of decedent and the others as beneficiaries under the will. The will stands." *Gettis v. McAllister*, 411 So. 2d 770, 771 (Miss. 1982) (citing *Edwards v. Edwards*, 193 Miss. 889, 11 So. 2d 450 (1943)). Thus, Sarah's will remains enforceable except as to the provisions made for Charles.

¶40. For these reasons, I dissent from the majority's decision to affirm the chancellor's judgment.

**BARNES, C.J., AND WESTBROOKS, J., JOIN THIS OPINION**.